# United States Bankruptcy Court
## Northern District of Florida

In re Barefoot Cottages
Development Company, LLC,

Case No.: 09-50089-LMK
Chapter 11

     Debtor.

## FIRST AMENDED DISCLOSURE STATEMENT, DATED OCTOBER 13, 2009

### *Table of Contents*

[Insert when text is finalized]

## I.    INTRODUCTION

This is the disclosure statement (the "Disclosure Statement") in the Chapter 11 Bankruptcy Case of *Barefoot Cottages Development Company, LLC.* (the "Debtor" or "Barefoot"). This Disclosure Statement contains information about the Debtor and describes the First Amended Reorganization Plan (the "Plan") filed by Whitney National Bank ("WNB"), a creditor of the Debtor, on October 13, 2009. A full copy of the Plan is attached to this Disclosure Statement as Exhibit "A." *Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.*

The proposed distributions under the Plan begin on page 11 of this Disclosure Statement. [General unsecured creditors are classified in Class 5, and will receive a distribution of 100% of their allowed claims, to be distributed in cash at confirmation or upon final order allowing said claim, whichever is later.]

### A.    Purpose of This Document

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case;
- How the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*, what you will receive on your claim or equity interest if the plan is confirmed);
- Who can vote on or object to the Plan;
- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan;
- Why [the Proponent] believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation; and
- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

B.     **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

1.     Time and Place of the Hearing to Finally Approve This Disclosure Statement and Confirm the Plan

The hearing at which the Court will determine whether to finally approve this Disclosure Statement and confirm the Plan will take place at a date, time, and place to be set by the Court by separate order.

2.     Deadline For Voting to Accept or Reject the Plan

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot in the enclosed envelope to Philip A. Bates, at Philip A. Bates, P.A., P.O. Box 1390, Pensacola, FL 32591-1390. See Section IV.A. below for a discussion of voting eligibility requirements.

Your ballot must be received by _____ or it will not be counted.

3.     Deadline For Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Court and served upon _____

_____

_____ by _____.

C.     **Disclaimer**

*The Court has [conditionally] approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted.*

## II.   BACKGROUND

### A.   Description and History of the Debtor's Business

The Debtor is a Florida limited liability company and owner and developer of Barefoot Cottages, a subdivision located in Port St. Joe, Gulf County, Florida, consisting of 140 residential lots, including ninety-two (92) beach cottage units with associated amenities, including pools, bike and walk paths, community meeting areas, and other amenities. In 2005, the Debtor purchased the land and eighty (80) of the cottages to be constructed were pre-sold or to turned over to the landowners as part of the land acquisition.

All site improvements and 92 cottages were constructed and paid for from the purchaser's earnest money deposits and two bank loans made by WNB to the Company. The deposits included $1,800,00.00 paid by Mr. Frans Oskam for five (5) cottages and $1,850,00.00 paid by Mr. George Landegger for five (5) cottages. Barefoot also used the proceeds of a construction loan and a credit line the company obtained from WNB originally totaling $21,452,953.00 to fund the construction after Barefoot had obtained approximately eighty-five (85) executed purchase contracts or pre-sold units.

### B.   Insiders of the Debtor

The Debtor has two managers, Curtis H. Gwin and H. Ray Shoults, as an authorized representative of the Shoults Family Partnership, Ltd. Neither of them purports to receive a salary from the Debtor.

### C.   Management of the Debtor Before and During the Bankruptcy

During the two (2) years prior to the date on which the bankruptcy petition was filed, the officers, directors, managers or other persons in control of the Debtor (collectively, the "Managers") were Ray Shoults and Curtis Gwin. The Managers of the Debtor during the Debtor's Chapter 11 Case have been Ray Shoults and Curtis Gwin.

After the effective date of the order confirming the Plan, the director, officer, and voting trustee of the Debtor, any affiliate of the Debtor participating in a joint Plan with the Debtor, or successor of the Debtor under the Plan will be Tom Risalvato, Liquidating Trustee. The responsibilities and compensation of these Liquidating Trustee are described in Section III.D. of this Disclosure Statement. Mr. Risalvato's credentials are set out on Exhibit "B."

### D.   Significant Events Leading to Chapter 11 Filing

Upon notice that their cottages were complete, only seventeen (17) of the purchasers honored their contracts. The Debtor, through its Counsel, Clark, Partington, Hart, Larry, Bond & Stackhouse ("CPH"), filed suits against the remaining purchasers for specific performance. However, due to an alleged failure of CPH to comply with § 720.401, Fla. Stat., Okaloosa County Circuit Court entered Final Summary Judgment

finding the purchase contract was cancelled and entered judgment on February 20, 2008 in favor of one of the purchasers requiring that the Debtor return the earnest money deposits. *See Pamela and Donald Sellazzo v. Barefoot Cottages Development Company, LLC*, the same being Case No. 2007-CA-2451-S, in the Circuit Court in and for Okaloosa County, Florida.

As a result of the ruling, the Debtor contends that it lacked sufficient funds to continue operations, including funding the company's ongoing obligations to the Barefoot Cottages Homeowners Association for maintenance assessments and other fees for units the Debtor had sold but still owned, insurance and taxes on those units, debt service to WNB, and the return of deposits to those purchasers with whom the Debtor was unable to reach settlement. The Debtor was also in dispute with WNB regarding the release of certain parcels to be conveyed free and clear to the Kenningtons and Mr. Oskam. The Debtor filed a voluntary bankruptcy petition on February 20, 2009.

Barefoot initiated a suit against CPH for the alleged defective Purchase and Sale Agreements that the Debtor contends failed to comply with § 720.401, Fla. Stat. CPH has error and omissions insurance in the amount of $10,000,000.00. While CPH has offered Barefoot Cottages $2,500,000.00 to settle the dispute, Barefoot has refused to accept this settlement amount.

In August of 2008, Barefoot, Curtis Gwin, and Ray Shoults filed a Complaint for declaratory and supplemental relief against WNB and others for a determination of the Plaintiff's rights regarding the Parcel Release Provisions contained in the Purchase and Sale Agreements (the same being Case No.: 2008 CA 4708 S). Barefoot maintained WNB's mortgage lien was inferior to the claims of purchasers who had already paid the full purchase price of their units. On September 10, 2008, WNB sued Curtis Gwin and Ray Shoults on their guaranties, seeking full payment in satisfaction of the notes (the same being Case No.: 2008 CA 5039). On September 17, 2008, WNB filed an Answer to Barefoot's Complaint for a declaratory judgment and counterclaimed by incorporating the claims raised and the relief sought in Case No. 2008 CA 5039. On October 10, 2008, Barefoot filed a Motion to Dismiss Case No. 2008 CA 5039 for failure to state a claim. On January 12, 2009, Whitney filed a Motion for Summary Judgment in the same.

E.    **Significant Events During the Bankruptcy Case**

On February 20, 2009, Barefoot Cottages filed a voluntary bankruptcy petition for Chapter 11 Reorganization. On February 23, 2009, the Debtor filed an Emergency Motion for a stay/injunction against WNB with regard to Case No. 2008 CA 5039. On or about February 20, 2009, the Declaration of Curtis Gwin was filed to support the pending Emergency 11 U.S.C. 105 Motion for an injunction against WNB. On February 25, 2009, the Court denied the Debtor's Motion.

On March 11, 2009, the Debtor sought and the Court approved the employment the Debtor's attorney, Edwin Rude, Jr. On March 18, 2009, the Debtor sought and the Court approved the employment of Steve Jay, a certified public accountant.

After the filing of the Bankruptcy Petition, the Debtor failed to formulate a plan prior to the filing of the WNB Plan. The Debtor failed to even communicate with Creditors regarding a proposed plan. The Debtor has operated at an approximate loss as

5

of the end of August, 2009, of $92,409.24, not including administrative expenses, ad valorem taxes, and other accruals, if any.

F.     **Projected Recovery of Avoidable Transfers**

If the Liquidating Trustee becomes aware that a pre-petition payment within ninety (90) days of the bankruptcy was made by the Debtor, or that any other avoidable transfer was made, the Liquidating Trustee shall seek immediately to avoid such transfer. Kown claims against Coastal Development Planning Co., a company owned or controlled by Mr. Shoults and Mr. Gwin, will be assigned to Class 7 under the Plan.

G.     **Claims Objections**

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, WNB reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in Article V of the Plan.

H.     **Current and Historical Financial Conditions**

The identity and fair market value of the estate's assets are listed in Exhibit "C." The information contained in Exhibit "E" is based on the Debtor's May 31, 2009 Monthly Operating Report.

The most recent post-petition operating report filed in the Debtor's bankruptcy case is set forth in Exhibit "D."

I.     **The Debtor's Claim Against Clark, Partington, Hart & Hart, P.A. ("CPH")**

In 2005, the Debtor retained CPH and W. Christopher Hart (collectively "Clark Partington") to prepare the legal documents necessary to proceed with the Barefoot Cottages development in Port St. Joe, Florida. In June 2007, purchasers of at least 50 units refused to close on sale of those units. The Debtor subsequently instituted breach of contract actions against defaulting purchasers of 44 of the units seeking either the extraordinary remedy of specific performance or money damages in the amount of the earnest money deposits ("EMDs").

The purchasers of one unit (the Sellazos) were successful in voiding their contract with Debtor based upon allegations that the purchase and sale contract failed to comply with § 720.401, Fla. Stat. The Debtor appealed this ruling to the First District Court of Appeal of Florida. However, before the First District could rule, and without attempting to obtain a different ruling from other judges facing the same issue at the trial court level, the Debtor voluntarily dismissed the *Sellazo* appeal and settled almost all the lawsuits with the purchasers by agreeing to retain the EMDs in lieu of an effort to seek specific performance.

Immediately after settling with the purchasers, the Debtor filed an action against Clark Partington claiming that, but for the allegedly negligent drafting of the purchase and sale contract, Debtor would have prevailed in its lawsuits against the purchasers by obtaining the equitable remedy of specific performance rather than retaining the EMDs. Clark Partington is aggressively defending this action and contends that it has substantial defenses to Debtor's claims, including that Debtor is entitled to no damages because Debtor abandoned its cause of action against Clark Partington when it abandoned its appeal of the Sellazos' ruling - which may have been reversed by the First District. In support of this defense, Clark Partington relies upon a recent opinion issued by the U. S. District Court for the Southern District of Florida in a similar case where the court ruled that a disclosure similar to the one utilized by Debtor complied with Section 720.401. Additionally, Clark Partington disputes that any alleged negligence of Clark Partington caused damages and contends that the purchasers refused to close on the sale of these units for other reasons, such as financial inability and alleged misrepresentations about the Barefoot Cottages project. Moreover, Clark Partington has asserted other defenses to the Debtor's claims, including that the purchasers would have prevailed in the breach of contract actions initiated by Debtor.

The Debtor's malpractice case is pending in the Circuit Court of Okaloosa County, Florida. It is not currently set for trial but is expected to be tried in mid-2010 if not resolved by this bankruptcy. Before suit was filed, Clark Partington had offered $2.5 million to settle the claims of the Debtor and any related claims, but that offer was rejected by the Debtor's principals and has been withdrawn.

J.    **The Whitney National Bank Claim ("WNB")**

The WNB claim in this case totals in excess of $13,196,452.28, not including costs and attorneys' fees.

The appraised value of the collateral for the WNB claim is between $7,800.000.00 and $7,900,000.00, according to two different appraisals, one by Grimes Appraisal and Consulting, Inc., dated June 26, 2009, appraising the property as of June 22, 2009, at $7,800,000.00, and the second appraisal by Michael J. Rogers of Rogers Evaluation and Acquisition, Inc., dated August 31, 2009, appraising the collateral as of July 23, 2009, at $7,900,000.00.

Ad valorem real property taxes for the calendar year 2008 on the property, which is the subject of the WNB mortgage and the two appraisals just described above, total in excess of $300,000.00. Those ad valorem taxes are delinquent since April 1, 2009, and bear interest at 18% per annum under applicable state law. That interest rate is not subject to modification in the confirmation of the Chapter 11 Plan. *See* 11 U.S.C. § 511.

The calendar year 2009 ad valorem taxes are a lien as of January 1, 2009, and will be billed in November 2009. It is anticipated that those taxes will be in an amount commensurate with the calendar year 2008 taxes. Thus, it is anticipated that the calendar year 2009 ad valorem taxes will be approximately $300,000.00 as well. The calendar year 2009 ad valorem taxes will not be delinquent until April 1, 2010, after which time they will bear interest at 18 % per annum.

The Debtor has raised three primary defenses in connection with the assertion of claims by WNB. First, the Debtor has contended that WNB is in breach of its loan

documents because WNB has failed to release the Kennington lots. The Kenningtons have, however, executed contracts which subordinate the Kenningtons' claim to the WNB mortgage. While the Debtor contends that certain aspects of the said contract are unenforceable, the provisions of the contract with respect to subordination <u>are</u> enforceable under applicable law. At no time did WNB agree that the Kennington lots would be superior to the WNB claim. Nevertheless, the Debtor has contended that WNB's failure to release the Kennington lots constitutes a breach or default under its loan documents. WNB vehemently denies this contention by the Debtor.

Second, the Debtor has contended that WNB is in breach of its loan documents because WNB has failed to release the Oskam lots. The Oskams have, however, executed contracts which subordinate the Oskams' claim to the WNB mortgage. While the Debtor contends that certain aspects of the said contract are unenforceable, the provisions of the contract with respect to subordination <u>are</u> enforceable under applicable law. At no time did WNB agree that the Oskam lots would be superior to the WNB claim. Nevertheless, the Debtor has contended that WNB's failure to release the Oskam lots constitutes a breach or default under its loan documents. WNB vehemently denies this contention by the Debtor.

Finally, the Debtor contends that WNB was obliged to release two parcels of property pursuant to the construction loan agreement upon request by the Debtor. WNB did, in fact, release those parcels, and the Debtor has no claim otherwise. Nevertheless, the Debtor now contends that WNB did not release those two parcels promptly or within sufficient time as to prevent damage to the Debtor. Nevertheless, it is apparent that the Debtor suffered no damage as a consequence of any delay by WNB in executing and delivering the said release, because the funds were used to pay down an unsecured non-interest bearing loan of the Debtor to an insider.

A Motion for Summary Judgment on the WNB claim against Mr. Shoults and Mr. Gwin, guarantors of the obligation, was denied by senior retired Judge Brace, who stated not that Whitney National Bank was not entitled to summary judgment, but rather that the issues in the case were "beyond his wisdom." A hearing on the WNB Motion for Summary Judgment has been reset and is scheduled to be heard on October 27, 2009.

## III.   SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A.   What is the Purpose of the Plan of Reorganization?

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

### B.   Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the

Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan Proponent has *not* placed the following claims in any class:

1.    *Administrative Expenses*

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 507(a)(2) of the Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

With respect to the administrative claims of professional engaged by the Debtor, WNB believes that the administrative claims should not exceed $25,000.00. The basis for this contention by WNB is as follows:

a)    This bankruptcy case did not need to be filed as there was no pending lien enforcement against any property of the Debtor or other pressing need for filing;

b)    It appears that the primary reason for filing this bankruptcy case was an effort on the part of guarantors who are the managers of the Debtor to obtain an order by the Bankruptcy Court staying collection action against those guarantors;

c)    No action taken by counsel for the Debtor has provided any meaningful benefit to the bankruptcy estate; and

d)    With respect to conduct by David P. Healey, special counsel for the Debtor, the nature and extent of his services to the Debtor in connection with the prosecution of the errors and omissions claim against CPH is of dubious value.

The following chart lists the Debtor's estimated administrative expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses Arising in the Ordinary Course of Business After the Petition Date | | Paid in full on the effective date of the Plan, or according to terms of obligation if later |
| The Value of Goods Received in the Ordinary | | Paid in full on the effective date of the Plan, or according to terms of |

| | | |
|---|---|---|
| Course of Business Within 20 Days Before the Petition Date | | obligation if later |
| Professional Fees, as approved by the Court. | | Paid in full on the effective date of the Plan, or according to separate written agreement, or according to court order if such fees have not been approved by the Court on the effective date of the Plan |
| Clerk's Office Fees | | Paid in full on the effective date of the Plan |
| Other administrative expenses | | Paid in full on the effective date of the Plan or according to separate written agreement |
| Office of the U.S. Trustee Fees | | Paid in full on the effective date of the Plan |
| TOTAL | | |

2.      *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief. WNB is unaware of any unpaid priority tax claims.

3.      *Ad Valorem Taxes*

The Debtor's real property is situate in Gulf County, Florida. Ad valorem real property taxes for the calendar year 2008 are delinquent and unpaid. Those taxes total in excess of $300,000.00. In addition ad valorem real property taxes for the calendar year 2009 will be billed during November, 2009. The 2009 ad valorem real property taxes are pre-petition taxes. *See In re Point Restaurant and Oyster Bar*, 86 B.R. 252 (Bankr. N.D. Fla. 1988).

To date, no proof of claim has been filed for the pre-petition taxes by the Gulf County Tax Collector. Under Fed. R. Bank. P 3002 (c)(1), governmental units have six (6) months following the date of the filing of the voluntary petition within which to file a proof of claim, if they be so advised. The 6-month period for a governmental unit to file a proof of claim expired on September 16, 2009.

The Debtor's Schedules and Statement of Affairs do not list the Gulf County Tax Collector as a Creditor.

Pursuant to 11 U.S.C. § 1129(a)(9)(D), if duly filed, the secured claim of Gulf County, Florida, would receive a distribution on account of its claim in cash in the same manner and over the same period of time as would have been the case for unsecured claims, as described in Class 5. In such event, both the calendar years 2008 and 2009 ad valorem taxes should be payable in cash in full at the time of confirmation of the Plan. However, since no proof of claim has been filed, and since the Schedules and Statement of Affairs do not list the Gulf County Tax Collector as a Creditor in these proceedings, WNB takes the position that the Gulf County Tax Collector is not entitled to be paid by distributions out of the confirmed Chapter 11 Plan, but rather, if it all, coincident with the sale of the real property of the Debtor pursuant to the liquidation features of the Plan. Accordingly, no particular provision has been made in WNB Plan for payment to the Gulf County Tax Collector. Post-petition ad valorem taxes to the Gulf County Tax Collector (ad valorem taxes for the calendar year 2010 and thereafter) will be a lien against the real property. To the extent the Debtor is the owner of the real property on April 1, 2011, the date that the calendar year 2010 ad valorem taxes become past due, WNB will be responsible for the payment of those taxes to the extent they encumber the collateral for the WNB claim and if not otherwise discharged.

C.   **Classes of Claims and Equity Interests**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

| Class | Impairment | Treatment |
|---|---|---|
| Class 1-Priority Claims | The class is unimpaired. | Class 1 is unimpaired by this Plan, and each holder of a Class 1 Priority Claim will be paid in full, in cash, upon the later of the effective date of this Plan as provided in Article VII, or the date on which such claim in allowed by a final non-appealable order. |

| Class 2 - Secured Claim of the Kenningtons | This class is unimpaired. | The Kenningtons shall receive a deed conveying title to them for Units A-5, B-15, B-18, and B-39, all in accordance with their agreement with the Debtor. WNB shall release said units from the lien of its Mortgage. |
|---|---|---|
| Class 3 - Secured Claim of Frans Oskam | This class is unimpaired. | Frans Oskam shall receive a deed conveying title to him for Units B-33, B-34, B-35, and B-36, and B-37, all in accordance with his agreement with the Debtor. WNB shall release said units from the lien of its Mortgage. |
| Class 4 - Secured Claim of WNB | This class is impaired. | WNB shall receive the proceeds from the sale of its collateral and shall retain its rights against the Debtor and the Guarantors. To the extent the sales proceeds are insufficient to pay the WNB claim in full, WNB will receive any remaining assets of the Debtor after payment of Class 5 Creditors. |

| | | |
|---|---|---|
| Class 5 - General Unsecured Creditors | This class is unimpaired. | Class 5 is unimpaired by this Plan and each holder of a Class 5 unsecured claim will be paid in full, in cash, upon the later of the effective date of this Plan as defined in Article VII, or the date on which such claim is allowed by a final non-appealable order. |
| Class 6 - Claim of CPH | This class is impaired. | This creditor will not be paid in any amount. |
| Class 7 - Equity Security Holders of the Debtor | This class is impaired. | The equity owners shall receive the assignment of the Debtor's claims, if any, against Coastal Development Planning Co., including preference / fraudulent transfer claims of the Debtor. |

## D.    Means of Implementing the Plan

### 1.    *Source of Payments*

Payments and distributions under the Plan will be funded by the liquidation of all the remaining cottages owned by Barefoot. CPH has agreed to fund up to$2,132,000.00 to the Plan which will be paid in exchange for the Debtor's release of CPH, and any of its lawyers, for any liability regarding the allegedly defective Purchase and Sale Agreements at issue in the Debtor's errors and omissions suit against CPH. The Debtor's suit against CPH will be dismissed with prejudice. Subject to the above terms, the funds will be used to pay the administrative expenses up to $50,000.00, priority tax claims, WNB for the release of the Mortgages at issue in the Kennington and Oskam Claims (totaling $1,610,280.00) and all remaining unsecured claims.

### 2.    *Post-Confirmation Management*

The Liquidating Trustee will be Tom Risalvato, CPA, or his Court-appointed successor.

This Plan will be effected by the appointment of Tom Risalvato, partner with Carr, Riggs & Ingram, LLC, Certified Public Accountants, as the Liquidating Trustee. The Liquidating Trustee shall receive payment of cash for or on account of CPH

13

and apply same to the payment of claims as provided herein. The Liquidating Trustee shall make arrangements for the sale or disposition of the units in the Debtor's Barefoot Cottages Development remaining after the transfer of same to the Kenningtons and to Frans Oskam as set forth in this Plan. In connection with the sale or disposition of the Debtor's real and personal property, the Liquidating Trustee shall engage a professional real estate broker or brokers to market the Debtor's Real Property first in separate units, and, if the Real Property is not fully sold out within not more than eighteen (18) months, second by bulk sale of the then remaining Real Property. Absent prior written consent of WNB, sales of the individual units of Real Property by or at the direction of the Liquidating Trustee, shall be for prices which shall net sales proceeds to WNB, after the payment of all costs of sale and closing, of not less than One Hundred Seventy-Five Thousand Dollars ($175,000.00). The bulk sale shall be advertised in at least two (2) newspapers of general circulation, one in Gulf County, Florida, and the other in Okaloosa or Walton County, Florida. The advertised notice of sale shall run at least twice in at least two consecutive weeks in both newspapers the second of which publications shall be at least ten (10) days prior to the bulk sale. In such bulk sale, WNB shall be entitled to bid by a credit to the extent of its then unpaid Claim in this case. The Liquidating Trustee shall be authorized to execute deeds in the name of the Debtor for purposes of sales or transfers of the Debtor's property.

E.    **Risk Factors**

The proposed Plan has the following risks:

Due to the current state of the market, the Debtor faces the issue of whether or not all of the units can actually be sold. Additionally, the Debtor will likely receive sales proceeds mich lass than the principal, interest, costs and fees owed to WNB.

F.    **Executory Contracts and Unexpired Leases**

The Plan, in Exhibit 5.1, lists all executory contracts and unexpired leases that the Debtor will assume under the Plan. Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any. Exhibit 5.1 also lists how the Debtor will cure and compensate the other party to such contract or lease for any such defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in Exhibit 5.1 will be rejected under the Plan. Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

### G.    Tax Consequences of Plan

*Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.*

## IV.    CONFIRMATION REQUIREMENTS AND PROCEDURE

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are <u>not</u> the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### A.    Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that only its class is impaired and approves the Plan. Therefore, there are no classes that are entitled to vote to accept or reject this plan.

### 1.    *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the

claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

### 2.    *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

### 3.    *Who is **Not** Entitled to Vote*

The holders of the following five types of claims and equity interests are *not* entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;

- holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes;

- holders of claims or equity interests in unimpaired classes;

- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code;

- holders of claims or equity interests in classes that do not receive or retain any value under the Plan; and

- administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan [and to the Adequacy of the Disclosure Statement].***

### 4.    *Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

### B.    Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan,

unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed later in Section [B.2.].

### 1. *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

### 2. *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a "cramdown" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

### C. **Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis is attached to this Disclosure Statement as Exhibit E.

### D. **Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

1.  *Ability to Initially Fund Plan*

The Plan Proponent believes that the Debtor will have enough cash on hand on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date. Tables showing the amount of cash on hand on the effective date of the Plan, and the sources of that cash are attached to this disclosure statement as Exhibit F.

2.  *Ability to Make Future Plan Payments And Operate Without Further Reorganization*

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments.

The Plan Proponent believes that there will be sufficient cash to fund the Plan.

## V.    EFFECT OF CONFIRMATION OF PLAN

### A.    DISCHARGE OF DEBTOR

Discharge.    The Debtor will not be discharged from any debt that arose before confirmation of the Plan.

### B.    Modification of Plan

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or re-voting on the Plan. The Plan Proponent may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Court authorizes the proposed modifications after notice and a hearing."

### C.    Final Decree

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

## VI.    OTHER PLAN PROVISIONS

Signatures as to Whitney National Bank's Amended Disclosure Statement

WHITNEY NATIONAL BANK

By: _____

Robert J. Sawyer

[type/print name]

As Its Vice-President

**The Plan Proponent**

By: _____

Philip A. Bates

**Attorney for the Plan Proponent**

**EXHIBITS**

Exhibit "A" –  Copy of Proposed Plan of Reorganization



Carr, Riggs & Ingram, LLC
151 Mary Esther Boulevard
Suite 301
Mary Esther, FL 32569

(850) 244-8395
(850) 243-5024 (fax)
www.cricpa.com

September 2, 2009

Mr. Bob Saxer
Whitney Bank

Dear Bob,

As I mentioned in my last email both myself and the firm have been involved as trustees in bankruptcy and guardianships.  Some of the duties we have performed include the following:

- Prepared monthly bankruptcy financial reports for the Bankruptcy Trustee.
- Gave regular depositions or verbal reports to Pensacola Federal Bankruptcy Judge, as to the status of potential real estate sales or restaurant operations.
- Provided supervision and oversight for almost 10 months to General Manager of a $12M dollar a year restaurant operation; over $2M in Net income.
- Provided oversight on a $25 million asset portfolio for the ward of the court.
- Prepared significant estate tax planning with attorneys.
- Contacted real estate appraisal and business valuation professionals to assist with sale of properties.
- Met monthly with bank trust officers to review asset portfolio.
- Prepared the necessary tax returns for the different entities.
- Signed all company checks; reviewed all bank reconciliations and financial statements on a monthly basis.
- Attempted to sell all real estate for fair market value and liquid all debt; meeting with some 50 potential buyers; provided sales information and negotiated potential real estate deals
- Met regularly with management to improve purchasing for restaurant by obtaining competitive bids for food, liquor, and supplies.
- Authorized maintenance repairs, approved and analyzed appropriate advertising programs.
- Sent condominium association owners assessment fee notices, accounted for
- Prepared bankruptcy plan with attorneys; prepared schedules to project future cash flows and how pre-bankruptcy would be liquidated.

Let me know if I can be of further assistance.  I look forward to working with you on this project.

Very truly yours,
Thomas J. Risalvato, CPA

*Carr, Riggs & Ingram, L.L.C*

Carr, Riggs & Ingram, LLC
Certified Public Accountants



EXHIBIT
"B"

Exhibit "C" –  Prepetition Financial Statements
(to be taken from those filed with the court)

Exhibit "D" – Most Recently Filed Postpetition Operating Report

Exhibit "E" – Liquidation Analysis

### *Plan Proponent's Estimated Liquidation Value of Assets*

**Assets**

| | |
|---|---|
| a.  Funds at end of period for 5/01/09 to 5/31/09 | $_____12,415.00_____ |
| b.  Accounts receivable | $_____ |
| c.  Real Estate | $__7,800,000.00 ***__ |
| d.  Office furniture, equipment and other assets | $_____60,000.00 or less |
| e.  Lawsuits or other claims against third-parties | $ unknown-contingent-disputed $__75,000.00__ |
| k.  Other intangibles (such as avoiding powers actions) | $__7,947,415.00_____ |

### *Total Assets at Liquidation Value*

| | |
|---|---|
| **Less:**<br>Secured creditors' claims, not including interest, fees, and costs | $16,000,000.00_____ $_____ |
| **Less:**<br>Chapter 7 trustee fees and expenses | $_____ |
| **Less:**<br>Chapter 11 administrative expenses | $_____1,200.00_____ |
| **Less:**<br>Priority claims, excluding administrative expense claims | $_____ |
| **Less:**<br>Debtor's claimed exemptions | $_____-0-_____ $____470,000.00_____ |
| (1) Balance for unsecured claims | $_____0%_____ |
| (2) Total dollar amount of unsecured claims | $____100%_____ |

*Percentage of Claims Which Unsecured Creditors*
*Would Receive Or Retain in a Chapter 7*                    $____100%____
*Liquidation*:

*Percentage of Claims Which Unsecured Creditors*
*Will Receive or Retain under the Plan:*

*** Based on Appraisal dated June 22, 2009, by Grimes Appraisal
& Consulting Group, Inc., 3 West Garden Street, Suite 351,
Pensacola, FL 32502

Exhibit "F" - Cash on Hand and Sources of Cash to Fund Plan

1.  Cash on Hand as of August 31, 2009                         $      9,350.82
        in Debtor-in-Possession Bank Account

2.  Cash Contribution by Clark, Partington, Hart & Hart, P.A.    $ 2,203,924.53
        Insurance Carrier

3.  Whitney National Bank - Balance of Funds Necessary for Implementation of Plan